IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DAVID BUNNELL, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. |
| BRYAN NETSCH, INTENSE PRINTING, | § | |
| INC., PRISM PROMOTIONAL SERVICES, | § | |
| INC., INTERACTIVE PRINTING AND | § | |
| CODING, and GRAPHICS INTELLECTUAL | § | |
| PROPERTY MANAGEMENT | § | |
| | § | |
| *Defendants.* | § | |

---

### PLAINTIFF'S ORIGINAL COMPLAINT

---

TO THE HONORABLE DISTRICT COURT:

COMES NOW Plaintiff Dave Bunnell ("Bunnell") and files this Action against Defendants Bryan Netsch ("Netsch), Intense Printing Corporation ("Intense"), Prism Promotional Services, Inc., Interactive Printing and Coding, and Graphics Intellectual Property Management (hereinafter "Intense Affiliates"), and for same would show the Court as follows:

# I
# Venue

1.      Venue is proper in the Northern District of Texas because virtually all of the relevant facts and actions underlying the claims occurred here and it is the residence and domicile of the Defendants.

---

2.     Jurisdiction is proper in this court because Bunnell's right to relief necessarily depends on the resolution of substantial questions of federal law, more specifically, violation of the Securities Acts of 1933 and 1934.

3.     This case is closely related to Civil Action No. 3:06-CV-00948-B-BD, *Giddy Up, LLC v. Prism Graphics, Inc., et al.*, and is therefore requested that the current case be assigned to Judge Jane Boyle.

## II
## Facts Common to All Causes of Action

4.     Bunnell has for many years been engaged in the business of being a printing broker. More particularly, Mr. Bunnell on behalf of himself or his employer arranges printing of various advertising and/or labeling by overseeing the procurement, purchasing and actual manufacture and distribution and delivery of the end product.

5.     Beginning in approximately 1998, Bunnell worked for a print broker company owned by Netsch called Prism Graphics, Inc. ("Prism" or "Debtor"). Bunnell worked as an employee for Prism pursuant to a 4-year Employment Confidentiality and Non-Compete Agreement (the "Agreement") executed effective the 11th of January, 1999 (attached as Exhibit 1). The Agreement provided basically that Bunnell was an employee who would receive a salary of $200,000.00 per year plus a potential to earn "performance units" which would be related to the "appreciation in the value of the common stock of employer". Supposedly these performance units would be based upon the greater of the Gross Operating Profit contributed by Employee (Bunnell) or the amount Employee's Gross Operating Profit bears to the Employer's Total Gross Operating Profit. The specific terms and conditions of this calculation were to be set forth in a "Phantom Stock Plan". As part of Bunnell's compensation, the performance bonus was

calculated on an annual basis and paid every six months. This bonus was specifically calculated and paid as a percentage of the "Gross Operating Profit" attributable to Bunnell's sales efforts as that term was defined in the Employment Agreement. The Agreement terminated by its terms on December 31, 2003 after which time Prism was not under any obligation to continue Bunnell's employment other than to pay the Performance Bonus as provided within that Agreement. However, the parties continued to treat the contract as being in effect after December 31, 2003, and Netsch continued to withhold bonuses earned by Bunnell after that date to pay for his "phantom stock" in Prism.

6.      The Agreement also provided that either party could terminate the employment portion of the Agreement without cause by giving 90-days written notice of such voluntary termination.

7.      Moreover, Netsch personally guaranteed the payment of all sums due under the Agreement, which would have included the performance bonuses earned by Bunnell.

8.      However, during the pendency of Bunnell's employment with Prism, Netsch would arbitrarily calculate the supposed Gross Operating Profit although Bunnell was never shown a Phantom Stock Agreement nor given access to the documents supporting Netsch's calculations. During the entire period of time from 1999 to 2007, Netsch would furnish calculations to Bunnell showing how much "Phantom Stock" he had been awarded, which stock was supposedly purchased by amounts withheld from Bunnell's Performance Bonus each year.

9.      From January 1999 until 2007 Netsch took a total of approximately $264,000.00 out of Bunnell's commission checks for the purchase of the "phantom stock" in Prism. However, from 1999 to 2008 no calculations were ever made of Gross Operating Profit as that term was defined in the Employment Agreement. In fact, the figures provided by Netsch at all times from

January 11, 1999 forward were completely arbitrary and illusory.  Netsch at all times maintained complete control of the finances of Prism and wrongfully transferred amounts between the bank accounts of Prism and other entities and to himself individually.  Because of Bunnell's complete lack of sophistication in accounting and corporate finance, Netsch was able to systematically cheat him out of compensation he earned.

10.     In the fall of 2007, a jury verdict was obtained against Prism, the Debtor, by a company called GiddyUp, Inc. which alleged, *inter alia*, that Netsch had engaged in fraud and various other improper activities on behalf of Prism.  Following the trial, a verdict was had against Prism, but not Netsch individually.  The judgment was signed on April 9, 2008 by the Honorable Jane Boyle, United States District Judge, and Prism subsequently filed for bankruptcy on or about the 24th of April, 2008.

11.     Following the jury verdict which had been rendered in 2007, Netsch decided that employees of Prism would begin to do business under the name of Intense Printing, a shell corporation which Netsch had organized in 1992.  In return for his agreement to stay on to help Netsch following the jury verdict and Netsch's subsequent hospitalization, Bunnell agreed to act as an employee of Intense, managing virtually all of the sales of the print brokerage business of the company on a going-forward basis.  At or about the time of the bankruptcy filing, Bunnell complained that his "ownership" interest in Prism had evaporated.  In response, Netsch promised Bunnell that if he would stay on to manage sales for Intermarc, he would be given 25% of the stock of Intense and its Affiliates and be made an officer of Intense as well.

12.     During this period from the jury verdict to the end of April 2008, Netsch informed Bunnell that he was going to make sure that there was no money in Prism to satisfy the Giddy Up judgment.  On information and belief, Netsch or his sons shredded Prism's files and transferred

all the assets of the company to himself and the Netch entities, including the accumulated performance bonus of Bunnell supposedly being retained to pay for the "Phantom Stock" in Prism.  Netsch paid his wife and sons outrageous salaries for performing little or no work.  On information and belief, Netsch, in his effort to denude the Debtor of funds, applied purchase orders issued to Prism and payments for Prism work to Intense Printing or his other three entities, ostensibly doing all this "on advice of counsel" – another falsehood.  Subsequently, in 2010, after the bankruptcy trustee filed suit against Netsch, Bunnell and others, Bunnell learned for the first time that Netsch had in 2006 and 2007 transferred hundreds of thousands of dollars into Intense, which was a complete fraud on Prism and its creditors because Intense at that time was a shell corporation which did no business at all.

13.     Moreover, while Bunnell was always entitled to reimbursement for his out of pocket expenses as an employee, Netsch declared that he would take three times whatever Bunnell claimed as expenses, regardless of any <u>actual</u> expenses.  Netsch never allowed Bunnell access to the books and financial records of Intense, and simply provided unaudited "pro formas" at the end of each year to show the "performance bonus" Bunnell was entitled to (as he had done at Prism).

14.     From 2008 to 2011, Netsch made numerous oral and written promises to Bunnell, and provided calculations of "profits" implying that the stock transfer in Intense and Affiliates had occurred.  These written documents went so far as to make calculations of how much in "net profits of the company" Bunnell was to receive as a "shareholder".

15.     Unbeknownst to Bunnell, however, Netsch never intended to give Bunnell any stock in Intense or any of the other affiliated companies, keeping ownership of Intense to himself (50%), Attorney Daniel Schreimann (40%) and a Vice President of Intense named Sandra Alley

(10%).  Moreover, Netsch always kept control of the check book and financial records of Intense and its affiliated companies, just as he had done under Prism.  In fact, although Netsch at one time showed Bunnell drafts of corporate documents making him an officer and shareholder in Intense and the Affiliates; Netsch never actually executed or filed the papers.  Moreover, Bunnell was denied access to the financial records of Intense and never saw or reviewed any tax returns of Intense or the Affiliates.

16.     In the spring of 2011, Bunnell found out that Netsch had been lying all along about the ownership of shares in Intense and the affiliated companies when he received a copy of a memo sent by Netsch to the Internal Revenue Service.  The memo stated that Bunnell had never owned any part of Intense or the Affiliates.  At that time, Bunnell confirmed with the company's outside accountant that Netsch never intended to file the corporate records he had been shown.  In addition, at approximately the same time, Bunnell became aware that the financial books and records of the Debtor Prism, Intense and the other Affiliates had been purposely altered and destroyed by Netsch in order to maximize his own income from the business to the detriment of Bunnell, and the creditors of Prism.  He also learned at that time that he had never been made an officer of Intense.

17.     In addition, Bunnell learned shortly before he voluntarily terminated his employment with Intense in 2011 that after the Prism verdict in September 2007 Netsch had ordered his sons to destroy hard drives of company computers at Prism in order to make it possible to drain as much income as possible from the Debtor and divert it to Netsch and his other companies without leaving a trail.  In addition, Bunnell confronted Netsch in 2011 with dummied invoices he found for one of the Intense Affiliates for "print work" in December 2007 (which Bunnell knew had never been done) in an approximate amount of $100,000.00.  When he

confronted Netsch with this discovery, Netsch told him not to worry about it and it was a matter "between him and Schreimann."   On information and belief the invoices were a way for Schreimann to return overpaid legal fees to Netsch which had been improperly claimed as "expenses" of the Debtor Prism.

18.     Bunnell also believes that at or about the time that Netsch made the decision to start doing business under Intense Printing instead of Prism, Netsch may have falsified records and purchase orders which had been accepted and produced by Prism and changed the work to make it appear as though the business had been done by Intense Printing instead.

19.     As a result of Netsch's falsification of the business records of all of the companies which he owned and controlled, including Intense, as well as the fraudulent expense reports and "salaries" for his family, Bunnell believes that Netsch has purposely understated income that is due and owing to Bunnell since 2008 from Intense and the Affiliates.

20.     After resigning from Intense as a result of his discovery of the stock fraud issue and the accounting irregularities, Bunnell made a good faith demand upon Intense for what he believed was his just compensation due and owing at the time based upon the financial statements provided to him by Netsch.  A true and correct copy of this demand is attached hereto as Exhibit 2 and incorporated by reference as if fully copied and set forth at length.

21.     Absent a proper accounting of the actual income of Intense Printing and its Affiliates over the past four years, Bunnell has no way of knowing how much in employee bonuses he is entitled to receive.  However, Bunnell is entitled to receive as his performance bonus 25% of the gross profits relating to the business he originated and managed as an employee of Intense.   Netsch has refused and continues to refuse to pay him any of the overdue compensation to which he is entitled.

## III
## Violation of Securities and Exchange Act 1933, 15 U.S.C.S. § 77a, et seq.

22.    Plaintiff incorporates by reference paragraphs 1-20 above as if fully copied and set forth at length herein.

23.    Plaintiff would show that over a period of time beginning in 2002, Defendant Netsch took advantage of Plaintiff's lack of business acumen and naivete by continually promising to Plaintiff that he was an owner of, or would be an owner of, companies that he was working for.  More particularly, although Plaintiff was a very good salesman of print brokerage services, and was adept at generating printing business for his employers, he has never had a bank checking account nor maintained a check book.

24.    Accordingly, Netsch was able to manipulate Bunnell over the years with, in some cases, outright fraudulent promises leading Bunnell to believe that he was an actual owner of stock in Prism, and following the Prism Bankruptcy, Intense and its Affiliates.

a.    From 1999 through 2008, for example, Netsch took $264,000 in performance bonuses from Bunnell's compensation supposedly to purchase "phantom stock" in Prism Graphics.  Of course, because it was "phantom stock" Bunnell never owned anything.  It was assured by Netsch that he, in fact, owned up to 10% of the business.  In effect, it was just a way for Netsch to underpay Bunnell $264,000 during the time he worked as a manager at Prism.

b.    Netsch, in the "phantom stock employment agreement" promised to pay Bunnell a percentage of the net profits of the business calculated as a percentage of the gross operating profit as a result of his "phantom ownership" of the company.  However, Netsch never made those calculations according to the Agreement and

4736032.2
60253.3

simply took money out of the corporation on a regular basis to minimize his taxes and to funnel the actual profits of Prism to his other investments, and to members of his family (who received outlandish salaries and bonuses for doing absolutely nothing for the most part).

c.     Netsch, beginning in approximately 2006 and 2007 began diverting funds out of Prism in order to avoid liability under the Giddy Up judgment.  This also had the effect of defrauding Bunnell out of the $264,000 which had been retained by Netsch for the purchase of the "phantom" interest in Prism.

d.     When Bunnell complained that Netsch's purposeful denuding of the assets of Prism and the filing of the subsequent bankruptcy cause his accumulated "savings" in the company to evaporate, Netsch promised him that he would be made a 25% owner of Intense Printing and its three other Affiliates if he agreed to stay on as sales manager for the company.

e.     At or about the time of the bankruptcy filing in April of 2008 of Prism, Netsch showed Bunnell drafts of corporate resolutions and other documents which, *inter alia* conveyed 25% of the stock of Intense Printing and the other Affiliates to Bunnell and made Bunnell an officer of Intense.

f.     Subsequent to the bankruptcy filing in April of 2008, Netsch routinely sent emails and quarterly income statements to Bunnell showing his percentage of profits in Intense and the Affiliates.  He was routinely addressed in these emails and reports as an owner to the extent of 25% of the business.

g.     As part of the fraud, however, Netsch did not provide accurate information concerning the profitability of the company.   As indicated above, the "25%

profits" of the company bore no relationship to reality because of the ongoing payment by Netsch of fraudulent expenses and payments to himself and other self dealing with members of his family.

h.      In or about April of 2011, Bunnell, after making demands for an accounting and asking to cash out his stock interest withheld by Netsch at Intense and the Affiliates, learned from the first time after talking to the company's outside auditor that Netsch did not file the corporate documents transferring a 25% interest to Bunnell or making him an officer.  Given that Netsch was embroiled (as one might expect) in a dispute with the IRS over his accounting, Bunnell was also shown a memo to the IRS in which it stated that Bunnell never had any ownership interest because he had never paid any consideration for his shares. Given that Netsch had promised Bunnell that his agreement to continue as manager of Intense and its Affiliates after the bankruptcy, and as some compensation for having his $264,000 "phantom stock purchase" wiped out by Netsch's bankruptcy fraud, these statements indicate a fraudulent intent on the part of Netsch concerning these securities.

25.     Where upon Plaintiff sues for his damages, attorneys fees and pre- and post-judgment interest provided under the Securities Act of 1993, 15 U.S.C. §§ 77a, et seq.

## IV
## Violation of Securities and Exchange Act 1934, 15 U.S.C.S. § 78a, et seq.

26.     Plaintiff restates paragraphs 1-24 above as if fully copied and set forth at length herein.

4736032.2
60253.3

27.     Plaintiff would show that the above referenced actions by Netsch in connection with the fraudulent sale of securities promised in connection with the interest in Intense Printing is also a violation of Section  78b(10b5) of the Securities Exchange Act of 1934.  Netsch is a controlling person of all corporate defendants, and his actions in defrauding Bunnell were knowing, intentional and calculated to damage Bunnell.

28.     More particularly, employment contracts promising shares as compensation are generally considered security transactions within 15 U.S.C.S. § 78j(b).  In connection with the promise to make Bunnell a 25% shareholder of Intense and its Affiliates, Netsch never intended to part with actual ownership and control of the corporations.  This was consistent with his pattern of deluding Bunnell into thinking he owned 10% of Prism through the purchase of "phantom" stock.  In like manner, he fraudulently told Bunnell:

  a.     The $264,000.00 he withheld from Bunnell's pay at Prism would be consideration for the 25% of the stock Bunnell would get in Intense and its Affiliates;

  b.     Remaining on as sales manager for Intense would also serve as consideration for the 25% stock interest;

  c.     Showing Bunnell "draft" corporate documents making him President of Intense and owning a 25% interest in the companies, which Netsch never intended to file (and which Netsch later disavowed to the IRS);

  d.     Sending Bunnell, on at least an annual basis, year-end accounting documents in which Bunnell was treated as a 25% owner of Intense and the Affiliates;

  e.     Promising Bunnell that, as a 25% owner of Intense and its Affiliates, he would get 25% of the net profits of each company – which was never done.

29.     Bunnell seeks the following:

---

a.    Transfer to him of 25% of the shares of defendants;

b.    A verified accounting of the books of Intense and its Affiliates from January 2008 to date;

c.    Disgorgement by Netsch of profits of Intense and its Affiliates in an amount equal to 25% of the actual net profits thereof.

d.    Such other equitable relief as the court deems appropriate in its discretion.

## V
## Breach of Contract

30.    Bunnell would show that irrespective of stock ownership in Intense Printing and its Affiliates, he was promised as a performance bonus 25% of the net profits on jobs which he originated or managed from approximately December, 2007 to date.  Bunnell would show that he is entitled to this percentage after any fraudulent accounting "costs" by Netsch relating to improper expenses, payments to his family members and personal distributions in excess of 3/4 of the net profits of the company has been excluded.

31.    For this sum, which will be in excess of $325,000, against Intense Printing and its Affiliates, Bunnell seeks judgment together with pre-judgment and post-judgment interest at the highest legal rate.

## VI
## Attorney's Fees

32.    Pursuant to § 38.001 Texas Civil Procedures and Remedies Code, Bunnell seeks his reasonable attorneys' fees against Intense for the trial of this matter, as well as any appeals.

## VII
## Performance of Guaranty

33.     Bunnell Incorporates paragraphs 1-24 of his Cross-Action as if fully set forth herein.

34.     Because Netsch personally guaranteed the payment of performance bonuses under the 1999 Employment Agreement with Prism, Bunnell is entitled to the $264,000.00 fraudulently withheld from his paychecks by Netsch.  As a result of the fact that there was no 'phantom stock" issued, the money was withheld by Netsch wrongfully and is owed by Netsch to Bunnell pursuant to the Guaranty, for which Bunnell sues.

## VIII
## Fraud

35.     Bunnell incorporates the allegations in paragraphs 1-27 above as if fully set forth herein.

36.     In the alternative, Bunnell would show that he was fraudulently induced to work for Intense Printing by Netsch's promises that he would receive 25% of the net profits on business he managed while at Intense following the Graphics' bankruptcy.  Moreover, he was promised that he would receive 25% of the stock of Intense and that he would be made an officer as well.  Netsch continued to embellish the fraudulent representations to Bunnell by showing him documents making Bunnell an officer and shareholder which Netsch promsied had been executed and filed.

37.     In fact, Bunnell found out from the company's accountant prior to his voluntary termination in 2011, that at all times since 1992, Netsch had remained as the President of Intense with his wife, Carol, as secretary, Defendant Schreimann was (and is believed to still be) the

---

4736032.2
60253.3

Vice-President along with Sandra Alley.  Netsch owned 50%, Schreimann 40% and Alley 10% of the stock of Intense.  Bunnell also found out about these details in a summary of the business of Intense and Debtor prepared by Netsch.

38.     Bunnell worked at Intense from late 2007 to 2011 in reliance upon the material promises of Netsch that he would be paid 25% of the net profits at Intense and Affiliates which were attributable to this efforts.  On a yearly basis Netsch provided accountings which purported to show these profits, but arbitrarily reduced those reported profits by fraudulent expenses, phony salaries to his family, and even "double-dipped" by paying himself "taxes" out of company profits to cover his personal tax liability on the inflated salary and bonuses which he paid himself.

39.     As a result of the forgoing, Bunnell is entitled to judgment in the alternative against the Netsch for fraud for payment of performance bonuses to which he is entitled.

a.     From the point in time when the legitimate operations of Intense Printing can be separated from the Debtors' operations in 2007 or 2008;

b.     As the "benefit of the bargain," in an amount of 25% of the net profits of Intense and the Affiliates attributable to the products and services generated by Bunnell after the fraudulent expenses, phony salaries of the family, improper transfers, and double accounting for taxes are removed from the calculations less amounts already received;

c.     Plus interest, post- and pre-judgment, on the above sums at the highest legal rate.

## IX
## Exemplary Damages

40.     Bunnell incorporates paragraphs 1-32 of the Cross-Action as if fully copied and set forth at length.

41.     Because the above actions of Netsch were willful, malicious and intended to cause Bunnell damage, Bunnell seeks an award of punitive damages in an amount to be determined by the trier of fact.

## Prayer

WHEREFORE, PREMISES CONSIDERED, Bunnell prays that upon hearing, judgment be entered that Bunnell be awarded 25% of the outstanding shares of Intense and its Affiliates, a verified accounting of those businesses from January 1, 2008 to date, judgment against Intense for breach of contract in the amount of 25% of the net profits attributable to his work, or alternatively, judgment for fraud against Netsch for the amounts of his withheld bonuses at Prism, and that Netsch disgorge 25% of the net profits of Intense and its Affiliates from January 1, 2008 to date, plus post- and pre-judgment interest thereon at the highest legal rate, and that he be awarded his reasonable attorneys fees, costs of court and all such other and further relief, both special and general, either at law or in equity, to which he may show himself justly entitled.

Respectfully submitted,


By:  */s/ Peter J. Harry*
     Peter J. Harry
     State Bar No. 09134600
     pharry@brownmccarroll.com

**BROWN MCCARROLL, L.L.P.**
2001 Ross Avenue, Suite 2000
Dallas, Texas  75201
(214) 999-6100
(214) 999-6170 *facsimile*

COUNSEL FOR PLAINTIFF
DAVID BUNNELL

---

4736032.2
60253.3

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was delivered to all counsel of record as shown below:

__X____       Mailed by certified mail, return receipt requested, postage prepaid, in a postpaid, properly addressed wrapper, in a post office or official depository under the care and custody of the United States Postal Service.

_____       Hand delivered by courier receipted delivery.

_____       Forwarded by next day receipted delivery service.

_____       Communicated by telephonic document transfer to the recipient's current telecopier number.

___X___       Electronic Service via the Northern District of Texas Electronic Case Filing System (ECF).

To:

      Beverly A. Whitley
      Heather H. Jobe
      BELL NUNNALLY & MARTIN, LLP
      3232 McKinney Ave., Suite 1400
      Dallas, TX  75204

on this 14th day of September, 2012.

                                */s/ Peter J. Harry*
                                  Peter J. Harry